AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means



# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One Apple iPhone 15 Pro Max further described in<br>Attachment A which is attached hereto and incorporated<br>herein | )<br>)<br>)   Case No. 24-MJ- 7129<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

One Apple iPhone 15 Pro Max further described in Attachment A which is attached hereto and incorporated herein currently in the custody of the Drug Enforcement Administration in Springfield, Illinois,

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21:841(a)(1) | Distribution of a Controlled Substance and Possession of a Controlled Substance<br>With the Intent to Distribute it. |

The application is based on these facts:

See attached Affidavit of Clayton C. McKone, Special Agent, Drug Enforcement Administration

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

REDACTED

_____
*Applicant's signature*

Clayton C. McKone, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone and electronic mail_____ *(specify reliable electronic means)*.

Date: ___7/16/2024___

City and state: ___Urbana, Illinois___

**Eric Long**  Digitally signed by Eric Long
Date: 2024.07.16 15:52:33 -05'00'
*Judge's signature*

Eric I. Long, United States Magistrate Judge
*Printed name and title*

FILED
JUL 16 2024
CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## A F F I D A V I T

I, Clayton C. McKone, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – one electronic device described as one Apple iPhone 15 Pro Max, IMEI: 351503403399999, currently in the possession of the Drug Enforcement Administration, Springfield, Illinois, and more particularly described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since January of 2022. I am currently assigned to the Springfield, Illinois, Resident Office (SRO). I completed Special Agent training at the DEA Academy in Quantico, Virginia. During Special Agent training, I received specialized training in various aspects of narcotics investigations, which include, but are not limited to, the use of physical, electronic, and human intelligence surveillance techniques, use of firearms, report and affidavit writing, execution of arrest and search warrants, and identifying illegal drug trafficking methods utilized by criminal organizations. Prior to joining the DEA, I was a police officer with the Michigan State Police ("MSP") for approximately five years. During my time with MSP, I was hand-selected to become a member of a specialized team with a focus on drug interdiction operations. As part of that

assignment, I participated in numerous traffic stops and operations involving seizures of illegal drugs, illicit drug proceeds, and illegal firearms. In addition, I have received drug trafficking training on several occasions throughout the country.

3.     Through my training and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed. I have participated in numerous domestic and international undercover operations involving the controlled purchase of illegal drugs from identified illegal drug traffickers. I am familiar with the laundering aspect of narcotic proceeds, and the dialect (lingo) and coded language used by narcotic traffickers to deter law enforcement. I am familiar with counter surveillance methods and the analysis of telephone records. I have monitored and assisted the interception of wire and electronic communications with experienced knowledge of mobile tracking devices and real time geo-location investigative methods. Based on my law enforcement experience, training, participation in other investigations, and conversations with other agents familiar with narcotics trafficking and money laundering matters, I am able to recognize methods and means used by narcotics trafficking organizations and build investigations to uncover their trafficking activities. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws in violation of Titles 18 and 21 of the United States Code. As a DEA Special Agent, I am authorized to investigate violations of the United States Code and to execute warrants issued under the authority of the United States.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     This court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, this Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A).

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.     The property to be searched is a one electronic device described as an Apple iPhone Pro Max, IMEI: 351503403399999, hereinafter referred to as the SUBJECT DEVICE, and is more particularly described in Attachment A, which is attached hereto and made a part hereof. SUBJECT DEVICE is in the possession of the Drug Enforcement Administration and currently held in the non-drug evidence vault in the Central District of Illinois.

7.     The applied for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data more

particularly described in Attachment B, which is attached hereto and made a part hereof.

8.     This investigation concerns alleged violations of Title 21, United States Code, Section 841, Distribution of a Controlled Substance and Possession of a Controlled Substance with the Intent to Distribute It.

## PROBABLE CAUSE

9.     The following is a summary of a narcotics investigation conducted in Danville, Vermilion County, Illinois, by the Danville Police Department and the Vermilion County Metropolitan Enforcement Group (VMEG) and in Springfield, Sangamon County, Illinois, by the Springfield Police Narcotics/Pro-Active Crime Unit (PAC). During the course of this investigation, Marcus A. McKinney ("McKINNEY" was identified as a narcotics trafficker and sex trafficker in Danville, Springfield, and surrounding areas.

10.    Beginning at least by April 6, 2023, and throughout this investigation, MCKINNEY was in the custody of the Federal Bureau of Prisons assigned to the Chicago Residential Reentry Management Program field office. At times, BOP furloughed MCKINNEY to "home confinement" at a location in Danville, Illinois, and at times, BOP assigned him to the Family Guidance Center located at 120 North Eleventh Street in Springfield, Illinois. MCKINNEY was completing service of a 96-month imprisonment sentence from Central District of Illinois Case No. 18-CR-20046 for the distribution of fifty grams of more of methamphetamine. This was MCKINNEY'S

4

second federal drug trafficking conviction. MCKINNEY'S hours of movement appeared to change frequently. Per the BOP's website, MCKINNEY was scheduled to be released by BOP in September of 2024.

11.     During the course of this investigation, Danville Police Department Detective Jon Stonewall identified multiple women who told Detective Stonewall that MCKINNEY distributed illegal drugs, including methamphetamine, cocaine, and fentanyl, to women in Danville in exchange for sexual activity with MCKINNEY or others. The women told Detective Stonewall that MCKINNEY was often violent with the women to whom he distributed illegal drugs. Some of those women have testified to this information under oath before a federal grand jury.

12.     Moreover, an individual currently facing federal drug trafficking charges recently told Detective Stonewall that he was involved in obtaining and distributing multiple kilograms of methamphetamine ice with MCKINNEY in Danville while MCKINNEY was assigned to the Chicago RRM. That same individual claimed that MCKINNEY created videos of the women to whom he distributed illegal drugs engaged in sexual acts with MCKINNEY or others.

13.     Despite his assignment by BOP to the Family Guidance Center, law enforcement identified during the investigation a separate residence and three storage units in Springfield that MCKINNEY used to conceal and distribute narcotics.

14.     Additionally, during the course of this investigation, PAC learned from VMEG that McKinney was using phone number 217-977-1906. PAC identified the phone number as a Verizon subscriber and requested subscriber information, device information, and toll records for 217-977-1906. Verizon returned subpoena records for 217-977-1906 that listed the following subscriber information: MARCUS MCKINNEY, 210 S STATE STREET, DANVILLE, IL. Verizon returned device records for 217-977-1906 that established that telephone number was assigned to the following SUBJECT DEVICE: IMEI 351503403399999, Equipment name IP15 PM 256 WT, determined to be short for an iPhone 15 Pro Max 256 gigabyte.

15.     Also, using a City of Springfield Customer Search Portal, law enforcement officers learned that MCKINNEY has utilities in his name at the residence at 2352 South Sixth Street in Springfield and that he moved into that location on November 21, 2023. The phone number listed for the residence was 217-977-1906. The utilities at that location remain currently active in MCKINNEY'S name.

16.     Law enforcement officers determined that MCKINNEY had the following vehicles registered to him:

a.     2004 BMW 530I Illinois license plate ER28071;

b.     2010 Escalade Illinois license plate EJ65251 registered to MCKINNEY at 110 S. Crawford St., Danville, IL;

c.     2017 Escalade Illinois License plate ER58679 registered to MCKINNEY at 110 S. Crawford St., Danville, IL;

      d.    2012 Chevrolet Traverse, Illinois License plate EQ13158.

    17.    During surveillance, officers saw MCKINNEY driving both Cadillac Escalades. Officers saw MCKINNEY multiple times driving both Escalades around Springfield and also driving them back and forth from the Family Guidance Center. MCKINNEY would routinely park the vehicles in the 100 Block of South 12th Street or in the 1100 block of East Adams Street while he was at the Family Guidance Center.

**The Traffic Stop of the BMW**

    18.    On June 6, 2024, at approximately 12:45 PM, PAC Detective Daniel Weiss conducted surveillance at 2352 S. Sixth St. Springfield, which Detective Weiss had previously identified as a residence of MCKINNEY. Detective Weiss saw a 2004 BMW, Illinois registration ER28071, parked at the residence that Detective Weiss determined was registered to MCKINNEY.

    19.    At approximately 1:30 PM, Detective Weiss saw the BMW back out of the driveway and travel north on Sixth Street. The BMW traveled east on South Grand Avenue before pulling into Fas Mart at 2900 E. South Grand Avenue. The BMW travelled eastbound on Interstate 72, towards Danville, and Sergeant Wangard paced it as travelling 80 miles per hour in a 70 mile per hour speed limit zone.

    20.    A short time later, Springfield Police Officer Gray conducted a traffic stop on the BMW on Interstate 72. MCKINNEY was not in the BMW. The driver gave Officer Gray consent to search the BMW. Officer Gray found a black backpack inside of the BMW that contained approximately 456 grams or one pound of suspected "ice" crystal

methamphetamine that field tested positive for the presence of methamphetamine by Illinois State Police Master Sergeant Weishaar. Following the ice seizure, the driver of the BMW cooperated with investigators and agreed to be a confidential source (CS) with the Springfield Police Department and the Central Illinois Enforcement Group (CIEG).

## The Confidential Source[1]

21.     Detective Weiss and CIEG Inspector Zock interviewed the CS at the Springfield Police Department. The CS stated that the CS had just left MCKINNEY'S residence on Sixth Street in Springfield. The CS said that MCKINNEY had loaned the CS the BMW. The CS identified MCKINNEY using a social media picture of MCKINNEY that Detective Weiss located on MCKINNEY's Facebook page.

22.     The CS stated that the CS had purchased the methamphetamine seized from the BMW from MCKINNEY and had purchased methamphetamine from MCKINNEY on multiple prior occasions. The CS said that the CS sold MCKINNEY multiple firearms in approximately September or October 2023, but did not know if MCKINNEY was still in possession of those firearms.

---

[1] To date, information provided by the CS has proven to be accurate. The CS has prior convictions for drug-related felonies, armed robbery, aggravated battery offenses, and theft-related felonies. The CS also has one prior conviction from more than ten years ago for willful obstruction of law enforcement officers. Since 2015, law enforcement is aware of only one criminal conviction of the CS, namely, driving on a revoked or suspended license. The CS has a Probation Violation Warrant out of Georgia that is not valid in Illinois.

23.     On June 12, 2024, at approximately 12:51 PM, Detective Weiss was contacted by the CS. The CS said that the CS was contacted by MCKINNEY via a video call on Facebook Messenger that day. MCKINNEY told the CS to come to MCKINNEY's Sixth Street residence to retrieve the CS's property that had been left in the BMW when it was towed following the traffic stop where the CS was arrested. The CS went to MCKINNEY's residence and spoke with MCKINNEY while retrieving the CS's property.

24.     While the CS was at the residence, MCKINNEY told the CS that he was going to give the CS one pound of methamphetamine that MCKINNEY had found in the basement to get the CS back on his feet after the seizure of the one pound of methamphetamine by law enforcement on June 6, 2024. MCKINNEY told the CS that the CS did not owe any money for the pound of seized methamphetamine. MCKINNEY told the CS that the CS did, however, owe him for the tow fees that MCKINNEY paid to get the BMW out of impound. The CS believed that MCKINNEY was "testing" the CS to see whether the CS was cooperating with law enforcement. The CS took the pound of ice from MCKINNEY on June 12, 2024, and then gave it to Detective Weiss later. While at MCKINNEY's residence, the CS saw three young girls inside.

25.     According to the CS, MCKINNEY was also driving white and black Cadillac Escalades that were located in MCKINNEY'S driveway, both of which were registered to MCKINNEY. The CS also told investigators that MCKINNEY said the CS could use the BMW or a Chevrolet Traverse (vehicle information listed below).

26.     The substance that the CS gave to Detective Weiss on June 12, 2024, appeared to be the "ice," weighed approximately 452 grams, and field tested positive for the presence of methamphetamine. Detective Weiss sent the substance to the DEA lab for further testing.

**The Storage Units**

27.     On June 14, 2024, the CS told Detective Weiss that MCKINNEY had three storage units in Springfield that MCKINNEY asked the CS to open in the CS's name, but paid the CS to open them. Based on the the CS's description, Detective Weiss identified the storage unit locations as follows:

    a.  Mansa Mini Storage, 2171 S. 9th St., Springfield, IL;

    b.  U-Haul Moving and Storage, 3250 Clearlake Ave. Springfield, IL; and

    c.  B & J Mini Storage, 2800 S. 6th St., Springfield, IL.

28.     Detective Weiss determined that the Mansa Mini Storage unit was the most recent unit rented in the CS's name. According to the CS, MCKINNEY used the CS's State of Illinois Identification to open the unit online while MCKINNEY and the CS were in a car together. According to Mansa Mini Storage, Unit 20 was listed in the CS's name and telephone number (217) 801-4576 and e-mail geezybaby217@gmail.com were

associated with Unit 20. Acccording to open source information, the e-mail address belongs to MCKINNEY and the phone number belongs to Brandi Rutherford, who is one of MCKINNEY'S Facebook "friends."

29.     Based on my training and experience, it is common for narcotics traffickers to use locations other than their residence to "stash" narcotics. They often use storage units in other people's names to distance themselves from the narcotics to avoid detection by law enforcement. As detailed herein, law enforcement officers observed MCKINNEY entering Unit 20 during a controlled buy of methamphetamine on June 20, 2024.

30.     The CS stated that MCKINNEY also asked the CS to rent a storage unit at U-Haul on Clearlake Avenue in Springfield on October 14, 2023. The CS provided investigators with Facebook Messenger messages from MCKINNEY'S Facebook account asking the CS to open the storage unit. MCKINNEY told the CS to put MCKINNEY'S "son's" name, Caylob Compton, and also Marcia Hyche on the unit as people who can access it. MCKINNEY told the CS his phone number was (217) 977-1906 in the messages. MCKINNEY told the CS to see if U-Haul had any of the "5.5 storages, open the small ones." The CS said that MCKINNEY went to U-Haul and went inside when the CS first rented the unit.

31.     Inspector Zock contacted a U-Haul employee and confirmed that Unit #1544 at U-Haul Moving and Storage at 3250 Clearlake Avenue, Springfield was in the CS's name. Both Caylob Compton, (217) 331-2450, 111 Kentucky Avenue, Danville, and

Marcia Hyche, (217) 497-53416, 220 North State, Westville, Vermilion County, Illinois, were listed as alternate contacts on Unit # 1544. Moreover, DPD and VMEG investigators determined that MCKINNEY rented the residence at 111 Kentucky Avenue in Danville and that a female had died of an overdose at the residence in August of 2023 while MCKINNEY was renting and using the residence.

32.     The CS stated that MCKINNEY later asked the CS to rent a storage unit at B & J Mini Storage. B & J Mini Storage confirmed that Unit #165 was rented in the CS's name beginning March 5, 2024. The CS said that MCKINNEY accompanied the CS to rent this unit, but stayed outside when the CS went inside the facility.

33.     Based on the foregoing, it appeared to me, based on my training and experience, that MCKINNEY was attempting to distance himself from these storage units to avoid detection by law enforcement or the Federal Bureau of Prisons.

**The Controlled Purchase**

34.     On June 18, 2024, Sangamon County Judge Grischow signed a State of Illinois overhear order. On June 20, 2024, the PAC Unit conducted a controlled purchase of approximately one pound of methamphetamine from MCKINNEY in exchange for $2000 using the CS. The details of the controlled purchase follow:

> 10:00am – CIEG Inspector Rexroad saw a white Cadillac Escalade (IL registration ER58679 in the name of Marcus MCKINNEY) parked on Adams Street, near 12th Street, in Springfield, Illinois.
> 10:10am – Sgt. Wangard saw a black Cadillac Escalade (IL registration EJ65251 in the name of Marcus MCKINNEY) parked at 2352 S. 6th Street.
> 10:19am – CS arrived at a previously arranged location to meet with investigators to obtain Official Advance Funds moneys and the recording equipment.

10:20am – TFO Redpath searched CS's vehicle; no contraband found.

10:26am – Inspector Zock searched CS; no contraband found.

11:13am – CS sent text message to MCKINNEY that read "OTW" meaning CS is on the way to MCKINNEY's residence at 2352 S. 6th Street.

11:35am – Covert audio/ video/ location recording devices on the CS's person and the CS' vehicle activated by law enforcement.

11:39am – CS left location.

11:52am – CS arrived at 2352 S. 6th Street.

12:16pm – CS exited the CS's vehicle and approached front porch to MCKINNEY's residence.

12:17pm – CS spoke with unidentified black male sitting on front porch of MCKINNEY's residence .

12:56pm – Inspector Mayes saw MCKINNEY's white Cadillac Escalade near 9th Street and Wellesley in Springfield.

12:58pm – Sgt. Wangard saw MCKINNEY approach front porch of 2352 S. 6th Street wearing white shirt, black bag, and blue jeans.

1:02pm – Sgt. Wangard saw MCKINNEY using his cell phone on front porch of 2352 S. 6th Street.

1:04pm – Sgt. Wangard saw CS enter front door of 2352 S. 6th Street.

1:07pm – Sgt. Wangard saw unidentified black male arrive on front porch and enter 2352 S. 6th Street (It should be noted the CS advised investigators that the CS and MCKINNEY had talked inside the residence before MCKINNEY stated he had to go retrieve the methamphetamine. MCKINNEY was observed on the covert video recording device walking east bound in the driveway and getting into his white Escalade and then leaving east bound in the alley towards Officer Manzanares).

1:38pm – Officer Manzanares saw MCKINNEY's white Cadillac Escalade northbound from alley between 6th Street and 7th Street, turn eastbound on Princeton, then turn north on 9th Street.

1:39pm – Special Agent McKone saw the white Cadillac Escalade enter Mansa Mini Storage.

1:41pm – Special Agent Rozell saw MCKINNEY, wearing white shirt and blue jeans carrying a black bag, enter Unit #20 within Mansa Mini Storage.

1:42pm – Special Agent Rozell saw MCKINNEY exit Unit #20, close, then lock door.

1:43pm – Special Agent McKone saw MCKINNEY's white Cadillac Escalade exit Mansa Mini Storage southbound on 9th Street then turn west on Princeton.

1:44pm – Officer Manzanares saw the white Cadillac Escalade westbound on Princeton, then turn south in the alley between 6th and 7th Street.

1:48pm – Sgt. Wangard saw MCKINNEY return to front porch from driveway and enter front door of 2352 S. 6th Street.

13

1:51pm – Sgt. Wangard saw CS exit front door of 2352 S. 6th Street with MCKINNEY .
1:53pm – CS opened rear passenger side door of MCKINNEY's white Cadillac Escalade and leaned into vehicle.
1:54pm – CS exited white Cadillac Escalade.
1:55pm – CS entered CS vehicle.
1:56pm – Sgt. Wangard saw white Cadillac south bound in alley between 6th and 7th Street crossing Wellesley.
1:57pm – CS left 2352 S. 6th Street in CS vehicle.
2:17pm – CS arrived at prearranged location.
2:18pm – CS provided purchased methamphetamine to Inspector Zock and TFO Weiss. TFO Redpath searched CS vehicle; no contraband was found.
2:32pm – Inspector Zock searched CS; no contraband was found.

35.     During this incident, the covert recording device used by the CS stopped recording audio while the CS was on the front porch of 2352 South Sixth Street, prior to the CS entering the residence. The CS turned the volume down on the CS's phone ringer because the CS was receiving text messages. It is suspected that this act disabled the audio recording function of the covert device. The CS did not know this would mute the audio. The video recording from the same device functioned and recorded properly throughout this operation.

36.     TFO Weiss, TFO Redpath, and Inspector Zock interviewed the CS after the controlled purchase. The CS immediately provided officers with a grey plastic Walmart bag that had a thin white string tied to it that was approximately a couple feet in length. Within this Walmart bag was an object wrapped in clear plastic, similar to Saran wrap, and covered in a petroleum product that appeared to be motor oil or diesel fuel. This

package had not been on CS's person or in their vehicle when Inspector Zock searched the CS or when TFO Redpath searched the CS's vehicle prior to CS meeting with MCKINNEY.

37.     According to the CS, the CS arrived at 2352 South Sixth and waited in the CS's vehicle for a short time. The CS got out and met with a person the CS knew as "Unc." The CS had met "Unc" before at this residence, but did not know the person's real name. "Unc" asked the CS if MCKINNEY was in the rear of the residence. When the CS said "no," "Unc" invited the CS to have a seat on the front porch with him and wait for MCKINNEY to arrive.

38.     The CS called MCKINNEY on the phone, and MCKINNEY answered by saying something to the effect of, "you know I see you on the front porch" and then ended the call. This appeared to indicate that MCKINNEY was monitoring the security cameras located on the front of his residence. The CS then waited on the porch with "Unc" until MCKINNEY arrived.

39.     MCKINNEY arrived and the CS said he was acting "funny" before inviting the CS inside the residence. The CS was feared that MCKINNEY suspected that the CS was cooperating with law enforcement. While inside the kitchen of the residence, the CS saw an unknown male meet with MCKINNEY. MCKINNEY went to the basement of the residence and returned with two small plastic bags containing a white substance. MCKINNEY provided one of the bags to the unknown male who then left.

15

The CS noted the other bag was left on the stovetop near a scale. The CS was unsure

what the white substance was, but believed it to be some kind of drug. The CS provided

MCKINNEY with the $2,000 OAF, which MCKINNEY put in his pocket.

40.     The CS overheard MCKINNEY speaking on the phone with a female. The

CS gathered from that conversation that the female was at the Super 8 Hotel in Room

152 and that MCKINNEY was planning to "pull up" on her, meaning planning to

deliver drugs to the female at her current location. The CS also overheard MCKINNEY

graphically describing his request for fellatio from the female upon his arrival. After

this phone call, MCKINNEY told the CS that he would need to put on his "jogging

shoes" to fulfill CS's request for methamphetamine.

41.     The CS waited in the living room of the residence; the CS believed

MCKINNEY left on foot to retrieve the methamphetamine from somewhere nearby.

While waiting in the residence, the CS noticed an unknown female within the residence

that the CS described as a minor. Upon MCKINNEY's return to the residence,

MCKINNEY told the CS that the methamphetamine was under the driver's seat of the

CS's vehicle.

42.     The CS then walked out of MCKINNEY'S residence and the CS returned

to the CS's vehicle. In the vehicle, the CS located a grey plastic Walmart bag containing

what the CS believed to be the pound of methamphetamine the CS had requested from

MCKINNEY on the driver's floorboard, near the pedals. The CS retrieved some of their

personal items from the rear passenger side door of MCKINNEY'S white Cadillac
Escalade before returning to the CS's vehicle and leaving the area.

43.     After the debrief with the CS was complete, Detective Weiss, Detective
Redpath, and Inspector Zock unraveled the packaging on the suspected
methamphetamine. Within the petroleum covered plastic wrap, they uncovered several
more layers of packaging to include plastic vacuum sealed bags and more plastic wrap.
At the core of this package, they located what appeared to be methamphetamine "ice".
DEA Special Agent Petersen used a TruNarc Handheld Narcotics Analyzer to field test
the suspected methamphetamine "ice". The TruNarc showed a positive test, indicating
the substance contained methamphetamine. The suspected methamphetamine "ice"
weighed approximately 481 grams with packaging materials. Detective Weiss sent the
substance to the DEA lab for further testing.

**State Search Warrants**

44.     On June 24, 2024, Sangamon County Judge Cadigan issued State search
warrants for the three storage units and MCKINNEY'S residence at 2352 South Sixth
Street in Springfield, Illinois. On June 26, 2024, agents executed the four warrants. The
results of the searches are detailed below:

        a.     2171 South Ninth Street, Unit #20, Springfield, Illinois storage unit:
        Agents seized approximately 481 grams of a substance that field tested
        positive for methamphetamine from inside of this unit. MCKINNEY had
        the key to this unit located on his person when he was later arrested.

Agents also observed MCKINNEY entering and exiting this unit during the controlled methamphetamine purchase on June 20, 2024.

b.      2800 South Sixth Street, Unit #165, Springfield, Illinois storage unit: Agents seized approximately 6,014 grams of a substance that field tested positive for cocaine from inside of this unit. MCKINNEY had the key to this unit located in his 2017 Cadillac Escalade when he was later arrested. Agents observed McKINNEY entering and exiting this unit on surveillance video on June 22, 2024.

c.      3250 East Clearlake Avenue, Unit #1544, Springfield, Illinois: Agents located no contraband in this storage unit.

d.      2352 South Sixth Street, Springfield, Illinois residence: Agents located approximately four grams of a substance that appeared to be crack cocaine and field tested positive for the presence of cocaine inside the residence. Agents also located three women in the residence, one of whom who had bruising that she stated was caused by MCKINNEY being violent toward her when she committed sexual acts with him after he gave her illegal drugs.

## MCKINNEY'S Arrest

45.     During the execution of the above-described search warrants, MCKINNEY was arrested by law enforcement officers. Officers searched MCKINNEY and located on MCKINNEY the SUBJECT DEVICE, which was observed to have a clear amber in color exterior protector. Officers seized the SUBJECT DEVICE and transported it to the Springfield Police Department, where it was placed into airplane mode and secured in the evidence vault for safekeeping.

46.     TFO Weiss and TFO Redpath interviewed MCKINNEY at the Springfield Police Station after he was read his *Miranda* rights and acknowledged them. MCKINNEY admitted that that he has bought an ounce of cocaine for $500 and sold it for $600 during the time he was assigned to the halfway house. He also claimed that he could purchase a kilogram of cocaine for $16,500. MCKINNEY then terminated the interview and said he wanted to be taken to jail.

## SPECIFICS REGARDING SEARCH OF ELECTRONIC DEVICES

47.     Searching the SUBJECT DEVICE for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used

it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

48.     Based upon knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a.  The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

b.  The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for

21

things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. Technical requirements:  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media:  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

49.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted

22

scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**BIOMETRICS**

50.    Unlocking the device with biometrics features:  The warrant I am applying for would permit law enforcement to compel certain individuals to unlock the SUBJECT DEVICE and/or programs and applications within the device subject to seizure pursuant to this warrant using the device's biometric features. I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device and programs and applications within the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device and programs or applications within the device through his or her fingerprints. For example, Apple offers a

23

feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device or program or application within the device. Once a fingerprint is registered, a user can unlock the device or a program or application within the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device or a program or application within the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face". During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device or a program or application within the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

51.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

52.  The passcode or password that would unlock the SUBJECT DEVICE are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access data contained within the SUBJECT DEVICE and/or programs and

applications within the device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

53.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

54.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.

Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is reasonably believed by law enforcement to be a user of the SUBJECT DEVICE biometric features in the same manner as discussed above.

55.     Due to the foregoing, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe fingers (including thumbs) of any individual, who is reasonably believed by law enforcement to be a user of the SUBJECT DEVICE to the fingerprint scanner of the SUBJECT DEVICE, front of the face of those same individuals and activate the facial recognition feature; and/or (3) hold the SUBJECT DEVICE in front of the face of those same individuals and activate the iris recognition feature, for the purpose of attempting to unlock the SUBJECT DEVICE in order to search the contents as authorized by this warrant.

<u>REQUEST FOR SEALING</u>

56.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an

opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## CONCLUSION

57.    Based on the forgoing, I believe Marcus MCKINNEY has the SUBJECT DEVICE to conduct the distribution of controlled substances. I respectfully assert there is probable cause that MCKINNEY and others yet to be identified are engaged in the distribution of controlled substances, and that within the SUBJECT DEVICE will be evidence, fruits, and instrumentalities of crimes, namely violations of Title 21, United States Code, Section 841, Distribution of a Controlled Substance and Possession of a Controlled Substance with the Intent to Distribute It.

Further affiant say not.

Respectfully submitted,



Clayton C. McKone
Special Agent
Drug Enforcement
Administration

Attested to by reliable electronic means in accordance with Fed. R. Crim. P. 4.1
on July   16th  , 2024.

Eric Long   Digitally signed by Eric Long
Date: 2024.07.16 15:53:07
-05'00'

ERIC I. LONG
United States Magistrate Judge

28

**ATTACHMENT A**

**Property to Be Searched**

This property to be searched is an Apple iPhone 15 Pro Max, IMEI 351503403399999, (hereinafter the "SUBJECT DEVICE"). The SUBJECT DEVICE is currently located in the possession of the Drug Enforcement Administration held in their Non-Drug Evidence Vault in the Central District of Illinois. Photographs of the SUBJECT DEVICE are included below.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.



such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.